UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CARLOS ARTURO PATINO RESTREPO,

                         Petitioner,

       -against-

 

UNITED STATES OF AMERICA,

                         Respondent.
--------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
15-CV-1804 (DRH) (ARL)

**LINDSAY, Magistrate Judge:**

      Before the Court, on referral from District Judge Hurley, is the application of the petitioner, Carlos Arturo Patino Restrepo ("Patino"),[1] for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, seeking to vacate his conviction for conspiracy to: (1) distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a) and (b)(1)(A)(ii) and 846; (2) import cocaine into the United States in violation of 21 U.S.C. §§ 960(a)(1), 960 (b)(1)(B)(ii) and 963; and (3) distribute and import cocaine internationally in violation of 21 U.S.C. §§ 959(a), 959(c), 960 (a)(3), 960 (b)(1)(B)(ii) and 963.  On April 25, 2012, District Judge Wexler sentenced Patino to 40 years on each of the three counts to run concurrently.  In his petition, Patino raises four grounds for relief, namely that, (1) newly discovered evidence demonstrates perjury by at least two key government witnesses; (2) the government withheld materially favorable statements made by two codefendants to which Patino lacked access; (3) trial counsel was ineffective in failing to call Jose Ernesto Vasquez Aguirre as a witness to impeach the testimony of Lina Orozco, a key government witness whose testimony linked Patino to the Eastern District of New York; and (4) appellate counsel was ineffective in failing to argue that

---

[1] Patino is also known as "Patemuro" and "Marcos."

the government's evidence and summation and the Court's jury charge unconstitutionally broadened the indictment in violation of the 5th Amend. Grand Jury Clause.[2]  For the reasons that follow, the undersigned respectfully recommends that Patino's petition for a writ of habeas corpus be denied.

## BACKGROUND

### A.    Patino's Indictment, Trial, Conviction and Appeal

Patino's conviction arises from an investigation into a widespread cocaine trafficking conspiracy involving the Norte Valle Cartel ("NVC") – a group of narcotics traffickers allegedly responsible for a significant portion of the cocaine entering into the United States.  ECF No. 649.[3]  The original indictment in this case was filed on October 10, 2002.  ECF No. 1.  On April 5, 2007, a federal grand jury returned the 8th superseding indictment (S-8), which, for the first time, charged Patino, a Colombian citizen, with conspiracy to possess with intent to distribute cocaine, conspiracy to import cocaine into the United States and international cocaine distribution conspiracy.  ECF No. 125.  On June 15, 2007, the government, through its embassy in Bogota, issued a formal request for Patino's extradition, which was granted on May 16, 2008.

---

[2] The memorandum submitted by Patino's counsel is confined to the first three grounds for relief listed in the petition.  *See* 15-CV-1804, ECF No. 19.  Although the memorandum notes that Patino intends to pursue the fourth ground for relief *pro se*, the undersigned will not consider any *pro se* submissions, which includes the *pro se* reply filed by Patino after he retained counsel.  *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989) ("[A] criminal defendant has no constitutional or statutory right to represent himself as co-counsel with his own attorney.").  It is well settled that "the decision to grant or deny 'hybrid representation' lies solely within the discretion of the trial court."  *Id.* (citing *O'Reilly v. New York Times Co.*, 692 F.2d 863, 869 (2d Cir. 1982)).  Although the petition was characterized as a *pro se* motion, the government was advised by defense counsel that he had been retained several weeks before the petition was filed.  ECF No. 15.  Indeed, the government received the petition along with a book of bound exhibits prepared by counsel.  *Id.*  Moreover, neither Patino nor his counsel have offered any compelling reason to justify Patino's appearance as "co-counsel."  Accordingly, the undersigned recommends that the fourth ground for relief based on the ineffectiveness of appellate counsel be denied.

[3] Unless otherwise noted, the Court's citation to "ECF No. __" refers to entries on the docket sheet in 02-CR-1188.  The Court's citations to "A" and "GA" are to Patino's and the government's appellate appendices, which have been provided to the Court. "T." refers to the 2011 criminal trial transcript in 02-CR-1188. "Pet." and "Mem." refer to Patino's *pro se* petition and the memoranda of law filed by the parties.

Patino Mem. at 2.  Following his arrest in Colombia, Patino was extradited to the United States and, on October 30, 2008, was arraigned on the 9th superseding indictment (S-9).[4]  ECF No. 233.

Patino's trial commenced on July 26, 2010.  ECF No. 567.  On August 13, 2010, the Court declared a mistrial after the jury reported that it was deadlocked.  ECF No. 590.  On September 1, 2010, the grand jury returned superseding indictment S-13 against Patino.  ECF No. 603.  The superseding indictment removed references to co-defendants and counts with which Patino was not charged, but the original three conspiracy counts remained unchanged.  *Id.* The retrial on S-13 commenced on March 22, 2011, before District Judge Wexler.  ECF No. 737.  On April 5, 2011, the jury found Patino guilty of all three conspiracy counts.  ECF No. 766.  As noted above, on April 25, 2012, District Judge Wexler sentenced Patino to concurrent terms of 40 years imprisonment for each of the three conspiracies, stating that it was the largest cocaine case he had seen in his 29 years on the bench.  A. 485-6.

Patino appealed his conviction and sentence.  ECF No. 880.  Specifically, Patino challenged 1) the instructions given to potential jurors by the magistrate judge during selection; 2) the effective assistance of counsel in failing to object to jury selection instructions; 3) the multiple conspiracies charge given by this Court; 4) the alleged misconduct of prosecutors during summation; 5) the alleged *Brady* violations as to four witnesses;[5] 6) the alleged misconduct of prosecutors in the grand jury; and 7) the alleged violation of the rule of specialty regarding Patino's extradition.  *See United States v. Restrepo*, 547 F. App'x 34 (2d Cir. Nov. 27, 2013).  On November 27, 2013, the Second Circuit affirmed Patino's conviction.  *Id.*  Notably, in

---

[4] The government initially indicted Patino under the erroneous name of Juan Carlos Patino Restrepo.  The error was corrected by filing the 9th superseding indictment.

[5] The *Brady* violations raised on appeal differ from the instant *Brady* claim.

rejecting Patino's *Brady* claim, the Court of Appeals discussed the strength of the government's case, noting that:

> Patino has failed to demonstrate that, even if the witnesses' statements were introduced at trial or the witnesses themselves testified to the vaguely exculpatory or impeaching information Patino alleges they possess, [] there was a reasonable probability that this would have led to a different result. *See Strickler,* 527 U.S. at 280 (defining evidence as "material" for *Brady* purposes where "there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different") (internal quotation marks omitted).

*Id*. at 43.  On March 31, 2014, the United States Supreme Court denied certiorari.  *Restrepo v. United States*, 572 U.S. 1035, 134 S. Ct. 1772, 188 L. Ed. 2d 596 (2014).

### B.    Relevant Facts and Proceedings

### 1.    Overview

At the retrial, the government presented the testimony of numerous witnesses, including: twelve Colombian drug traffickers that conspired with Patino; Lina Orozco ("Orozco"), the wife of Patino's cousin; Lieutenant David Yadrick, a United States Coast Guard Officer; and a forensic chemist.  *See* Gov. Appellate Brief 4-5.  Ten of the cooperating witnesses had appeared at the first trial.  Patino Mem. at 2.  Significantly, cooperating witness Luis Fernando Castaño Alzate ("Castaño"), who grew up in the La Virginia area of the Norte Valle region of Colombia, had not appeared at the first trial.  T. 742-62.  Orozco, who was a key witness at the retrial, had testified at both trials after entering into a non-prosecution agreement with the government.  T. 617-65.  In any case, Castaño, Orozco along with Juan Carlos Sierra Ramirez ("Ramirez") testified about Patino's distribution network in the United States.  T. 617-65, 760-62 and 971-73. In addition, at the retrial, two police officers testified that Patino used bribes to obstruct law enforcement investigations into his narcotics trafficking activity.  T. 828-46, 986-98, 1001-05. Finally, several witnesses testified about Patino's connection to high-ranking members of a

4

paramilitary group known for providing security and protection to narcotics traffickers.  T. 741-47, 962-72.

Collectively, these cooperating witnesses along with other witnesses testified that Patino was a boss of the NVC who controlled drug trafficking in the La Virginia-Viterbo area of Colombia and had conspired with numerous persons to transport cocaine from Colombia through Central America and Mexico to the United States.  T. 350-88, 493-95, 551-85, 732-53, 747-52, 961-69, 1130-32, 1234-50, 1299-1305, 1337-46, 1350-52.  Accordingly, the government argued in summation that the testimony of its cooperators unequivocally established that Patino was a Columbian drug kingpin engaged in a massive conspiracy to send drugs from Columbia across the borders onto the streets of the Eastern District of New York.  T. 1392-93.

### 2.    Testimony of the Cooperating Witnesses

#### a.    *Luis Fernando Castaño Alzate ("Castaño")*

Cooperating witness Castaño testified that, in 1995, he attempted to start a small cocaine processing lab in the Tamburas area of the Norte Valle but was told by Patino's workers that no cocaine processing labs could be opened in the area without the express consent of Patino, who controlled the La Virginia-Viterbo area of the Norte Valle along with another conspirator.  T. 733-35.  Subsequently, between 1995 and 2001, Castaño purchased large quantities of coca base for a cocaine processing lab located near Viterbo.  T. 727-28.  According to Castaño, when he did so, he understood from other conspirators that the cocaine processed by this lab was to be provided to Patino and another trafficker.  T. 729-30.

Castaño also testified that Patino had a close friendship with "Rogelio" from La Oficina de Envigado ("Envigado").  T. 758.  To this end, Castaño indicated that the Envigado was a debt collection office that operated on behalf of individual narcotics traffickers.  T. 741-42.  Castaño

stated that the Envigado office had a reputation for extreme violence, sometimes torturing or even killing debtors. T. 758. Castaño noted that when he was arrested, the Colombian newspapers claimed that he was the head of the Envigado, but Castaño said that the report was not true. T. 763.

Finally, Castaño testified that he knew Patino's cousin, Jaime Patino ("Jaime"), who worked to sell Patino's cocaine in New York together with Jose Ernesto Vasquez Aguirre ("Vasquez"). T. 760-63.

b.    *Lina Orozco Hincapie*

Orozco testified that on four or five occasions in 1996, her husband Jaime brought approximately 200 kilograms of cocaine belonging to Patino into the basement of a house in Chicago near O'Hare airport where she and Jaime lived along with Vasquez. T. 628-30. Orozco stated that she assisted her husband in delivering Patino's cocaine while in Chicago. T. 630-31. Orozco further testified that between July and December 1997, she lived in a small townhouse on Long Island with her husband and Vasquez, which was used to stash narcotics trafficking money for Patino. T. 634-37.

Orozco also testified that in July 2000, she and Jaime returned to the United States for approximately three to four months and stashed large sums of money for Patino in apartments in College Point and Jackson Heights, Queens. T. 638-40, 643-46. Vasquez was not in Queens during that time period. T. 639. Also, in December 2001, Orozco accompanied Jaime to a meeting with Patino in Pereira, Colombia. T. 647. Jaime tried to collect a $200,000 debt that Patino owed him for narcotics-related work. T. 647-50. Vasquez was not present for the 2001 meeting. T. 649.

c.    *Angel Cabaleiro Caicedo ("Cabaleiro")*

Cabaleiro testified that, in January 1997, he fled Colombia following the death of his father, a drug transporter.  T. 346, 349; GA 115.  In April 1997, Cabaleiro returned to Colombia after Patino interceded with another NVC boss to ensure Cabaleiro's safety.  T. 350-58, GA 115-17.  To this end, Cabaleiro met with Patino in Pereira, where Patino indicated he had resolved the danger to Cabaleiro from another Norte Valle boss who had killed Cabaleiro's father.  T. 354-59, GA 116-17.  According to Cabaleiro, Patino arrived at that meeting accompanied by approximately eight men armed with pistols in two vehicles.  T 351-54; GA 115-16.  Patino then hired Cabaleiro to arrange for a fishing boat to carry approximately 2,000 kilograms of cocaine, supplied by Patino and his worker, Oscar Gomez, from the Pacific coast of Colombia to the coast of Mexico.  T. 362-64, 370.  Cabaleiro monitored the fishing boat via radio during the trip.  T. 364-65.  In 1997, Cabaleiro transported another approximately 2,000-kilogram load for Patino.  T. 364-65.

Cabaleiro further testified that, in 1998, a third shipment of more than 2,000 kilograms of cocaine belonging to Patino and other conspirators was lost at sea between Colombia and Mexico.  T. 366-67.  Specifically, a fishing boat crew communicated to Cabaleiro via radio that a Coast Guard airplane was bearing down on them, so the crew threw the cocaine into the water.  T. 367.  The lost cocaine was never recovered.  T. 368-69.  Following the incident, Cabaleiro met with Patino to discuss what had happened and no further cocaine trips were proposed at that time.  T. 369.

However, in or around September 2002, Cabaleiro became involved in additional cocaine trafficking with Patino.  T. 375-77, 383-85.  Specifically, Cabaleiro met with Patino at Patino's chalet in Cerritos, Colombia.  T. 383, GA 118.  Cabaleiro also met Nelson Cruz a/k/a "Chiquita

Cruz" ("Cruz") and Lucas Salazar, who met separately with Patino.  T. 383; GA 118.  Later, Cabaleiro was enlisted by Cruz and Salazar to move shipments of 2,300 kilograms of cocaine to Mexico for Patino.  T. 384; GA 118.  After some delay, the shipment of more than 2,300 kilograms cocaine went out and arrived successfully in Mexico.  T. 385-87; GA 118-19. Subsequently, at the end of October 2002, Cabaleiro coordinated a second shipment of 2,300 kilograms with Cruz and Salazar.  T. 387-88; GA 119.  However, the second load was seized by law enforcement in October 2002.  T. 388-90; GA 119.  Specifically, the day after the speedboat left Colombia with the second load, the boat hull cracked and the boat was intercepted by the United States Coast Guard.  T. 389-90; GA 119.  As the Coast Guard approached, Salazar told Cabaleiro that Cruz had authorized the crew to dump the cocaine.  T. 389-90; GA 119.

     *d.*     *Bayron Jimenez Castaneda ("Jimenez")*

Jimenez, an accountant for the Colombian paramilitary group "Autodefensas Unidas de Colombia" ("AUC"), testified that at the end of 1997, he was introduced to Patino to discuss a potential drug deal with one of the AUC bosses, Ramiro Vanoy, also known as "Cuco." T. 569-72.  Specifically, Jimenez attended a meeting with Patino in Bogota, Colombia to discuss this potential drug deal.  T. 572.  At this meeting, Patino said that he wanted to buy 2,000 kilograms of cocaine from Cuco and also needed the use of an illicit landing strip called "Torre Ochenta" to transport the cocaine.  T. 575.

Jimenez also testified that in early 1998, he flew with Patino and others to meet Cuco in Chigorodo-Antioquia, Colombia.  T. 577-81.  During the trip back to Bogota, Patino told Jimenez that he and Cuco had agreed that two 1,000-kilogram loads of cocaine would be shipped from the landing strip by airplane.  T. 581-83.  Jimenez further stated that another co-conspirator had told him that those shipments were destined for the United States by way of Guatemala.  T.

582-83.  Finally, Jimenez testified that the AUC received "taxes" for Patino's first 1,000-kilogram load, indicating that the load was successfully sent from Colombia.  T. 584-85.  Jimenez did not know whether the second 1,000-kilogram load was actually sent out.  T. 585.

  e. *Wenceslado Caicedo Mosquera ("Caicedo")*

  Caicedo testified that between approximately 1998 and 2000, he transported cocaine to Mexico and Guatemala for Patino's workers, Daniel Morales ("Morales") and Diego Soto ("Soto").  T. 1235-36; GA 138.  In or around 2001, Caicedo learned from Morales that Patino was the owner of the cocaine he had been transporting.  T. 1236; GA 138.

  In approximately March or April 2002, Caicedo accompanied one of Patino's workers to Pereira, Colombia to meet with Patino and discuss whether Caicedo could set up a trip from Colombia to Mexico by boat to transport more than 2,000 kilograms of cocaine owned by Patino and another conspirator.  T. 1237-43; GA 139-40.  During the meeting, Patino was protected by ten to fifteen bodyguards and workers armed with pistols and submachine guns.  T. 1238-39; GA 139.  Patino confirmed that Caicedo had previously been working for him and informed Caicedo that Caicedo's prior contact would no longer be acting for Patino.  T. 1240-42; GA 139-40.

  In June or July 2002, Caicedo transported 2,000 kilograms of cocaine for Patino.  T. 1242-43; GA 140.  Shortly thereafter, Caicedo met with Patino to discuss another delivery of between 2,200 and 2,500 kilograms of cocaine.  T. 1244-45.  Caicedo also successfully transported this cocaine from Colombia to the coast of Mexico and Guatemala between November and December 2002.  T. 1243-45.

  f. *Lieutenant David Yadrick ("Lieutenant Yadrick")*

  Lieutenant Yadrick testified about the October 2002 boat incident which Cabaleiro had described.  He confirmed that when the boat was intercepted, the crew set it on fire and jumped

into the ocean.  T. 233-34.  Nevertheless, the Coast Guard searched the vessel and recovered approximately 70 kilograms of cocaine.  T. 234, 237.  The remaining burned kilograms of cocaine were sunk along with the speedboat.  T. 242-43.

g.    *Gabriel Villanueva Ramirez ("Villanueva")*

Villanueva, a worker for another NVC boss, Luis Hernando Gomez Bustamante, also known as "Rasguño" ("Bustamante"), further testified that, in October or November 2002, he attended a meeting with NVC bosses, including Bustamante, Miguel Solano ("Solano") and Patino, that was conducted at one of Patino's ranches in Cerritos, Colombia. T. 1339-40. According to Villanueva, at this meeting, Patino mediated a dispute between Bustamante and Solano concerning two cocaine shipments that had been seized in New York by law enforcement.  T. 1340-43. Villanueva further testified that, following this meeting in the fall of 2002, Patino was included in shipments of cocaine being sent through one of Bustamante's drug offices.  *Id.*  Specifically, the conspirators sent four drug shipments, each consisting of 2,100 kilograms of cocaine, of which Patino owned 700 kilograms in each shipment.  T. 1343-44; GA 147.  Villanueva indicated that these shipments went to Mexico and that Bustamante's kilograms were then sent to New York.  *Id.*  Villanueva did not know the ultimate destination of Patino's cocaine.  T 1345; GA 147.

h.    *Jorge Ivan Gonzalez Ramirez ("Gonzalez")*

According to the testimony, in 2003, Patino was involved in two shipments of cocaine, weighing 2,200 and 2,500 kilograms, that were being transported by Caicedo.  T. 1245-50. Gonzalez testified at trial that he had acted as Patino's representative with respect to those transactions.  T. 1130-32; GA 133-35.

i.    *Juan Carlos Sierra Ramirez, alias "Tuso" ("Sierra")*

Another co-conspirator, Sierra, who had not testified at the first trial, also averred that he had shipped between 25 to 35 cocaine loads of approximately 1,200 kilograms to New York between 1997 and 2005.  T. 921-32.  Specifically, Sierra testified that he was a cocaine transporter for both the AUC and other narcotics traffickers associated with the NVC.  T. 919-27. Sierra indicated that he and his co-trafficker, Dagoberto Gildardo (a.k.a. "Percheron"), each took on investors and that Patino invested in a number of these cocaine shipments sent into New York from Mexico.  T. 929-37, 961-62.  Sierra noted, however, that Patino had his own employee who was responsible for organizing the distribution of his share of the Sierra/Percheron cocaine once it reached New York.  T. 950-961, 973.

Sierra further testified that he assisted the AUC with its financial operation by collecting fees on the AUC's behalf from independent narcotic traffickers who needed to transport merchandise through AUC-controlled territory and wanted to use his services.  T. 927-29. According to Sierra, he had been brought in to join the AUC by one of its top commanders, the "general inspector" Diego Fernando Murillo Bejarno (a.k.a. "Don Berna"), who served as a "father" figure in his life.  T. 928.  As a result, Sierra knew the close relationship that existed between the AUC's leaders and Patino.  T. 929, 934-35.

In fact, Sierra described meetings between Patino, NVC leaders and AUC commanders, including a meeting at a private ranch called El Vergel.  T. 962-68.  Sierra stated that the purpose of the meeting was to discuss the expansion of the AUC paramilitaries in the North Valley.  T. 961-69.  According to the trial testimony, the financing of this AUC expansion was to be paid by the Norte Valle drug traffickers including Patino.  T 968; GA 130-31.  Meeting participants also discussed that the AUC would not enter cities already controlled by cartel leaders such as the

towns of La Virginia and Viterbo which would remain under Patino's control.  T 965-69; GA 130-31.

Sierra was not invited to participate in the meetings because he lacked sufficient rank within the AUC organization.  T. 965-69.  But after the meeting ended, Don Berna told Sierra that the NVC traffickers had agreed to help fund an AUC expansion in exchange for an AUC promise to "respect" NVC territories, including Viterbo.  T. 966-70.

*j.      Leonidas Molina Triana ("Molina")*

Molina, a retired Colombian Police Officer, also testified at trial.  Molina stated that in September 2002, he was contacted by another retired police officer about an investigation of Patino by the unit that Molina had formerly commanded.  T. 979, 988-89.  Molina said he agreed to obtain the investigation file and stop the investigation of Patino.  T. 989-93.  Indeed, after obtaining the official file, Molina met with Patino near the Bogota airport, where he agreed to exchange the file for approximately $125,000.  T. 994-1000.  Thereafter, in December 2002, Molina met with Patino again, and Patino requested that Molina pull a drug investigation file for two of Patino's friends.  T. 1001-06.  Molina agreed to pull the files in exchange for approximately $75,000 each.  T. 1005-06.

*k.      Carlos Andres Mesa Carrillo ("Mesa")*

Mesa, another Colombian Police Officer from the Sensitive Investigations Unit, testified that he was paid by another police officer working for Patino to provide information about whether American authorities were investigating Patino.  T. 819, 828-31.  Specifically, in October 2006, Mesa met Patino along with co-conspirator Ramirez at an apartment in Bogota to

answer Patino's questions about American investigators and possible extradition to the United States.[6]  T 835-44.

    *l.*    *Olmes Duran Ivarguen ("Duran")*

Duran was another drug trafficker awaiting extradition to whom Patino had befriended in Combita prison.  T. 454, 493-94.  Duran testified that he was asked by Patino to help locate Cabaleiro.  T 454, 493-94.  Patino told Duran that he was concerned about Cabaleiro because they had done business together, including a load that had been seized by the authorities (i.e., the October 2002 seizure) and that he needed help to locate Cabaleiro in order to "eliminate" him. T. 494.

### 3.    The Defense Case

The defense called a former Immigrations and Customs Enforcement agent, Romedio Viola ("Viola"), to testify about prior statements of Orozco, which the defense claimed were inconsistent with her trial testimony.  T. 1371-84.

### D.    New Evidence

As noted above, Patino alleges that newly discovered evidence demonstrates that Sierra and Castaño perjured themselves.  In support of this argument, Patino points to the findings of the Court of Justice and Peace for the Superior Court in the City of Medellin ("the Court of Justice and Peace").  Graham Decl. Ex. A.  It appears that on September 3, 2014, following a full-day hearing in July, the Court of Justice and Peace issued a ruling expelling Sierra from

---

[6] Notably, in April 2007, while Patino was awaiting extradition in Combita prison in Colombia, Patino attempted to contact his co-conspirators to ensure they would not reveal their prior illegal conduct with Patino to the United States government.  T. 455, 1256.  In fact, Patino sent a message to witness Villanueva, telling him, "[W]hen you get to New York, say that you do not know Patemuro." T. 1348-50.  Patino also bribed prison officials to arrange a meeting with Caicedo, who was also being held at Combita prison.  T 496, 1252-54.  Patino similarly told Caicedo, "[W]hat we have done here stays here. Nothing of what we have done can go any further than you or I. Let's just pretend that you and I have done nothing." T. 1256, 1310.

Colombia's Justice and Peace Program. *Id.* The Justice and Peace Program was established by the Colombian government to encourage members of paramilitary groups to put down their weapons, confess their crimes and make reparations, by offering eligible individuals leniency with respect to punishment. Patino Mem. at 7-8. Although drug traffickers cannot be excluded from the program simply because they have not participated in armed conflict, a "pure" drug trafficker who engages in criminal activity primarily for personal benefit – and not to further counterinsurgency goals – must be excluded from the program as a matter of law. Graham Decl. Ex. A., 28-32.

In this case, the Court of Justice and Peace determined that Sierra was not a true member of the AUC, having trafficked in narcotics solely for his own financial gain rather than to advance the AUC's counterinsurgency efforts. *See id.* at 50. In fact, the Court of Justice and Peace noted that none of the AUC commanders aside from Don Berna had produced any evidence of Sierra's criminal activity consistent with his supposed status as an AUC member. *See id.* at 34. The Court of Justice and Peace also noted that several verified AUC members who had initially supported Sierra's application had since recanted their statements. *Id.*

## DISCUSSION

### A.    Standards Governing Petitions Under 28 U.S.C. § 2255

"A sentencing court may 'vacate, set aside or correct' a conviction or sentence that was imposed 'in violation of the Constitution or laws of the United States[.]'" *Almonte v. United States,* No. 13-CR-692 (DLI), 2021 WL 4295370, at *2 (E.D.N.Y. Sept. 21, 2021) (citing 28 U.S.C. § 2255(a)). "Because collateral challenges are in 'tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" *Mui v. United*

*States,* 614 F.3d 50, 53 (2d Cir. 2010) (citation omitted).  Accordingly, to succeed on a collateral attack against a final judgment under Section 2255, a petitioner must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun,* 73 F.3d 8, 12 (2d Cir. 1995) (inner quotation marks and citations omitted); *Almonte,* 2021 WL 4295370, at *2.

Moreover, "it is well established that Section 2255 may not be used to litigate issues that have been decided adversely to a defendant on direct appeal." *Scarlett v. United States*, No. 10-CR-809 (KAM), 2021 WL 2809818, at *8 (E.D.N.Y. July 6, 2021)(citing *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001)).  Finally, in ruling on a motion under Section 2255, the district court is required to hold a hearing unless, as in this case, the motion, files and records of the case conclusively show that the petitioner is entitled to no relief.  *Scarlett*, 2021 WL 2809818, at *9. With these standards in mind, the Court turns to the three grounds for relief asserted in the memorandum submitted by counsel on Patino's behalf.

### B.   Newly Discovered Evidence

Patino first argues that the decision of the Court of Justice and Peace to expel Sierra from the Justice and Peace Program evinces that Sierra committed perjury at trial with respect to his membership in the AUC and, more specifically, with respect to meetings that took place between Patino and the AUC's high level commanders.  Patino Mem. at 7-10.  To this end, Patino claims that the Justice and Peace program found that Sierra was not a "true member" of the paramilitary AUC as he trafficked narcotics primarily for his own personal gain rather than to fund the paramilitary efforts.  *Id.*  Patino also argues that evidence proffered by the Columbian prosecutor during that hearing regarding Castaño's membership in Envigado impairs Castaño's credibility

as a witness. *Id.* "[N]ew evidence in a Section 2255 proceeding . . . is evidence that is discovered after the original hearing, and which could not, with due diligence of counsel, have been discovered sooner." *Giacalone v. United States*, 739 F.2d 40, 43 (2d Cir. 1984) (internal quotation marks and citations omitted). In this case, Patino relies on evidence that was introduced at a 2014 hearing in Columbia. Patino's Mem. at 7; Graham Decl. Exs. A, B. As is indicated in Patino's petition, he was tried in 2011, sentenced in 2012, and the Second Circuit appealed his conviction in 2013. Accordingly, the information on which he relies could not have been discovered sooner.

Nonetheless, Patino bears the burden of convincing this Court that in light of this newly-discovered evidence, he would have been acquitted. *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L.Ed.2d 828 (1998) (no reasonable juror would have convicted petitioner given all the evidence). Patino has failed to meet this burden. To begin with, Patino's newly discovered evidence claim relies entirely on the findings of the Court of Justice and Peace which, as the government points out, is not as a law enforcement body. Gov. Mem. at 9-10. As such, those findings are not "competent evidence" that Sierra and Castaño perjured themselves with respect to their respective memberships in the AUC or Envigado.

More importantly, even if the undersigned were to accept the findings of the Court of Justice and Peace, nothing in that Court's report demonstrates that Sierra's or Castaño's trial testimony was perjurious or that such testimony would have affected the jury's verdict. Sierra testified at trial that "he worked for the AUC," not that he was a member. T. 926. Specifically, Sierra stated that he "transport[ed] cocaine for other individual narco traffickers" and was in the "financial department" rather than the military or political departments of the AUC. T. 927, 929. In fact, on cross examination, Sierra was specifically asked about the Justice and Peace Program

16

and indicated that in 2004 he was not accepted to the program because the Colombian government determined that he was not a member of the AUC, but rather was a narcotics trafficker. T. 1076-77. Sierra further testified that, in 2006, he was able to convince the government that he was a member of the AUC; however, he admitted at trial that he had only cooperated with them financially and was not really a member. *Id.* For example, Sierra testified that he bought assault rifles for the AUC but had not killed anyone. T. 1077-78. Accordingly, far from being in conflict, the newly discovered evidence is virtually identical to Sierra's testimony at trial.

Similarly, the Court of Justice and Peace documents submitted by Patino do not demonstrate that Castaño's testimony was perjurious.[7] A fair read of the translation of Exhibit A is as follows: "[Colombian] Prosecutor concludes" that" Sierra was a member of the "illegal armed organization" known as "La Oficina de Envigado" and that his partners "were a small and select group of drug traffickers . . . who held this criminal structure through substantial contributions in order to receive security and protection that they offered, . . .." Graham Decl. Ex. A at 7-10. Castaño was listed as one of those partners. *Id.* Ex. A. at 9. Although the prosecutor also stated that the "top leader of this organization" "established a partnership with Casa Castaño and put "La Officiana" to the services of the [ACU]," *see id.,* this prosecutor's conclusion was discussed in a proceeding regarding Sierra. Castaño did not testify nor was he

---

[7] It warrants mention that the translation offered by Patino of the Justice and the Peace Program documents do not appear to be accurate. As the government notes, the translation includes several incomplete sentences. The translator also changed and removed punctuation. For example, the translator removed the comma after the nickname "El Gordo Botija," thereby placing the nickname next to the name Luis Fernando Castaño in the paragraph. Graham Decl. Ex. A at 62. It is clear that in the Spanish version, the Colombian Prosecutor was referring to two separate drug traffickers, that being, Luis Fernando Munoz, alias "Millos", alias "El Gordo Botija" and "Luis Fernando Castaño." *Id.* The translation of Ex. B, which recounts a similar conclusion of the prosecutor, also omits a comma that would have made clear that the nickname "El Gordo Botija" was associated with a drug trafficker named "Luis Fernando Munoz," not Luis Fernando Castaño. Ex. B, 29 and 114.

represented at the hearing.  In fact, it appears that no proof was presented to the Court of Justice and Peace regarding the Envigado office other than the "conclusion" of the prosecutor.  In addition, as evidenced by the section entitled "Considerations Made by the Court," the Court of Justice and Peace made no findings whatsoever with respect to Castaño.[8]  *Id.* at 22.

    In contrast, at Patino's trial, Castaño was asked on direct if he used the services of the Envigado office to collect drug debts and responded that he did.  T. 741-42.  Castaño also described that he hired the Envigado office to kidnap individuals who owed him drug debts on two occasions and acknowledged knowing that the Envigado office "would sometimes torture and even kill people to collect their debt." T. 754-58.  Castaño further testified that when he was arrested, the Colombian newspapers reported that he was the chief of the Envigado office, although he claimed that it was not true.  T. 763.  Nonetheless, through cross examination, it was made clear to the jury that the articles described him as a "head of the officina Envi[g]ado," who could go to the second in command, Rogelio, and that Rogelio would provide a service in exchange for a 30 percent commission of anything he collected.  T. 807-09.  In sum, this testimony is not at all inconsistent with the prosecutor's conclusion that witness Castaño was a drug trafficker "partner" of the Envigado drug collection office who made "substantial contributions in order to receive security and protection that they offered, and with the purpose of receiving [its] services" including collecting debts.  Graham Decl. Ex. A at 9.  Accordingly, even assuming that the "evidence" from the Court of Justice and Peace is accurate as to Sierra and Castaño, there is nothing before the Court that demonstrates that Patino "would most likely

---

[8] The same prosecutor's conclusion was discussed at the July 2014 video conference hearing.  Graham Decl. Ex. B at 3.

not have been convicted" but for those witnesses testimony.  Thus, the undersigned respectfully recommends that this claim be denied.[9]

### C.    Brady Claims

Patino also claims that his conviction should be reversed and a new trial ordered because statements made by two co-defendants, Jose Aldemar Rendon Ramirez, alias "Mechas" ("Rendon") and Dagoberto Florez Rios, alia "Chuma" ("Florez"), following their deportations were not mentioned at trial and were materially favorable.   *See* Graham Decl. Exs. C, D. Specifically, Patino contends that Rendon, who served as the NVC's chief cocaine seller in New York, and Florez, who served as a manager within the NVC structure, both pleaded guilty under cooperation agreements but did not testify against Patino.  *See* Patino Mem. at 10-11.  *Id.*  Yet, according to the statement signed by Rendon, which is annexed to the petition, Rendon claims that he informed the government in 2009 that Patino was not a member of the NVC and that he had never taken part in any drug shipments with Patino.  Graham Decl. at Ex. C.  Similarly, Florez prepared a statement in which he says that in 2008 and 2009, he too informed the government that Patino was not a member of the NVC and that he had never taken part in any drug shipments with Patino.  *Id.* at Ex. D.

Pursuant to *Brady v. Maryland,* 373 U.S. 83, 87–88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*,* the Government must disclose evidence to a defendant when the evidence is "material" to guilt or punishment.  *Rigas v. United States*, No. 02-CR-1236 (KMW), 2020 WL 2521530, at

---

[9] Given the undersigned's conclusion, the Court does not find that there is sufficient evidence to merit a hearing on this issue.  As noted above, a petition for habeas corpus requires a hearing to resolve disputed issues of fact *unless* the record shows that the petitioner is not entitled to relief.  *See* 28 U.S.C. § 2255 (emphasis added).  The Second Circuit has consistently held that the standard to be used in making this determination is whether, "if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief."  *Dalli v. United States*, 491 F.2d 758, 760–61 (2d Cir. 1974) (citations omitted).  In addition, "the district court may use methods under Section 2255 to expand the record without conducting a full-blown testimonial hearing," and may rely on letters, documentary evidence, and affidavits.  *See Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (the district court did not abuse its discretion by limiting its evidentiary review to affidavits).

*5 (S.D.N.Y. May 15, 2020), aff'd, 848 F. App'x 464 (2d Cir. 2021). "To establish a Brady violation, a petitioner must show that: (1) the undisclosed evidence was favorable to him; (2) the evidence was in the state's possession and was suppressed, even if inadvertently; and (3) the defendant was prejudiced as a result of the prosecution's failure to disclose the evidence. *United States v. Restrepo*, 547 F. App'x 34, 42–43 (2d Cir. 2013) (citing *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001)).  "Evidence is [considered] favorable if it is either exculpatory or impeaching, and it is material if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012) (internal citations omitted)(citing *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S. Ct. 2188, 165 L. Ed. 2d 269 (2006)).  "'[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,' but rather, a conviction must be reversed 'upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.*

Notably, "[u]ndisclosed impeachment evidence is not material in the *Brady* sense when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998) (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972)).  "For example, where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Id.* (citing *United States v. Helmsley*, 985 F.2d 1202, 1210 (2d Cir. 1993)).  Moreover, "[e]vidence is not 'suppressed' for *Brady* purposes if the defendant 'either knew, or should have known, of the

essential facts permitting him to take advantage of any exculpatory evidence.'" *Restrepo*, 547 F. at 42–43 (citing *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006)).[10]

Here, the government has chosen not to address whether it had actual or constructive knowledge of the information or whether the statements themselves are authentic because it believes any factual response of this nature would likely put persons in Colombia in danger of bodily harm from Patino.  Gov. Mem. at 19, n. 11.  Nevertheless, the government contends that Patino cannot meet his threshold burden of showing materiality in light of the voluminous evidence offered at trial.[11]  The undersigned agrees.

First, although the government has not offered facts to establish that Rendon's and Florez's statements were coerced, it warrants mention that the statements were prepared in Columbia and were not signed under the penalties of perjury.  Graham Decl. Exs. C, D.  More importantly, even assuming the statements genuine, the statements do not undermine confidence in the outcome of the trial given the substantial evidence presented by the government.  Notably, none of the drug shipments discussed at trial involved Rendon or Florez and neither was mentioned in the testimony of any witness.  *See* Gov. Mem. at 19-20.  Moreover, the fact that Rendon and Florez now claim that Patino was not a member of the NVC and had never taken part in drug shipments "with them" is immaterial.  Indeed, a careful read of Rendon's and Florez's statements suggest only that Patino was not part of a subset of the NVC under another NVC boss, Hernando Gomez Bustamante, alias Rasguño.  Graham Decl. Exs. C at 4, D at 6.

---

[10] Although the undersigned has recommended dismissal of the *Brady* claims on different grounds, *see supra*, the Court also notes that Patino admits in his petition that his attorneys contacted these two witnesses during the proceeding but they were unwilling to meet until they completed their own prison terms.  Pet. At 6.  The actions of counsel suggest that Patino may have had reason to believe that these witnesses' statements were favorable prior to the conclusion of his case.

[11] The government has requested an opportunity to supplement its response with factual information regarding the authenticity of the statements prior to a hearing being ordered should the reject its materiality argument.

In comparison, the government presented evidence at trial that Patino was a boss in his own right and controlled a different area of the North Valley.  T. 1350-51.  In fact, numerous witnesses testified at trial about Patino's role in the NVC.  For example, Villanueva testified that he worked for Rasguño and there were hundreds of people whom he conspired with Rasguño, including Patino.  T. 1329-31.  Villanueva explained that the Bustamante/Rasguño's organization operated in and controlled the city of Cartago while Patino controlled the town of Viterbo on behalf of the NVC.  T. 1335-36, 1350-51.  Sierra similarly testified that after the AUC expanded into the North Valley, Sierra learned that Patino controlled Viterbo and Rasguño controlled El Zarzal and Cartago with another boss.  T. 965-68.  As such, Rendon's and Florez's statements that Patino was not part of a subset of the NVC controlled Rasguño is simply a red herring.

Equally immaterial is the fact that Rendon and Florez allegedly advised the government that they, themselves, had never taken part in drug shipments with Patino.  No one at trial testified that Patino had engaged in drug shipments involving Rendon or Florez.  And, Rendon's and Florez's statements concerning their personal lack of involvement with Patino does nothing to impeach the trial testimony given by numerous witnesses concerning their own drug deals with Patino.  Accordingly, as there is no reasonable possibility that these witnesses' statements could have led to a different result, the undersigned also recommends that the *Brady* claims be dismissed.

### D.     Ineffective Assistance of Counsel Claim

Finally, Patino argues that he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel failed to call Vasquez to rebut the testimony given by Orozco about her husband's distribution of Patino's drugs in America and to attack the credibility of

22

Castaño who corroborated Orozco's testimony.[12]   Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687-88, 692-94.  The first prong embraces a "'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland,* 466 U.S. at 690).   Indeed, the performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" *Id.* (quoting *Rompilla v. Beard,* 545 U.S. 374, 408 (2005)).  "The determinative question at this step is not whether counsel 'deviated from best practices or most common custom,' but whether his 'representation amounted to incompetence under prevailing professional norms.'" *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

The second prong focuses on prejudice to petitioner.  To establish such prejudice, a petitioner must show "a reasonable probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003). "Reasonable probability" means that the errors were of a magnitude such that they "undermine confidence in the outcome." *Pavel v. Hollins,* 261 F.3d 210, 226 (2d Cir. 2001)

---

[12] Ineffective assistance of counsel "may appropriately be raised for the first time in a 2255 motion, 'whether or not the petitioner could have raised the claim on direct appeal.'" *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (quoting *Massaro v. United States*, 538 U.S. 500, 504, 509 (2003)).

(quoting *Strickland,* 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole,* 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland,* 466 U.S. at 695). Accordingly, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland,* 466 U.S. at 691).

In this case, Patino has not adequately demonstrated that his trial counsel was ineffective in failing to call Vasquez. To begin with, A. Eduardo Balarezo, Patino's criminal defense attorney, has averred that "to the best of his recollection, Patino did not discuss the possibility of Vasquez as a witness" prior to or during the trial. Balarezo Decl. ¶ 4. He further attests that even if Patino had asked him to call Vasquez and had given him contact information for Vasquez, who was in Columbia at the time, Balarezo would not have had the means to locate Vasquez. *Id.* To this end, Balarezo explains that he was dependent on Patino's Colombian attorneys to locate possible witnesses in Colombia.[13] *Id.*

In addition, Patino has not offered any evidence that Vasquez had even been located prior to trial or that he would have come to the United States. According to the government, Vasquez would have faced criminal liability in the United States for his own involvement in the drug conspiracy had he come to the United States to testify. Gov. Mem. at 24. In addition, there is no way to tell if, once here, Vasquez would have asserted his Fifth Amendment right in connection with trial testimony. In fact, the government goes as far as to suggest that any testimony of Vasquez made while his family was still located in Colombia in an area controlled by Patino

---

[13] The government contends that Patino chose not to unearth this individual until after his sentencing despite the fact that he controlled the area where this witness lived. Gov. Mem. at 22-23.

would have been unreliable and opened the door to cross-examination by the government concerning numerous acts of violence, including the murder of Jaime Patino, which is believed to have been ordered by Patino.  Gov. Mem. at 24.

Moreover, with respect to the content of the proffered declaration, Vasquez simply asserts that he was living with Orozco in Chicago and on Long Island as "a tourist, financially supported by sporadic construction work."[14] Graham Decl. Ex. E.  Based on this declaration, Patino asks this Court to conclude that had Vasquez been called, Vasquez would have testified that he never sold drugs for Patino.  Patino further argues that Vasquez' testimony would have rebutted the testimony given by Orozco during the second trial.  The undersigned is unable to reach this same conclusion.  *See Rodriguez v. Portuondo*, No. 01 Civ. 0547 (PAC), 2006 WL 2168314, at *10 (S.D.N.Y. Aug. 1, 2006) ("[W]hether counsel's failure to impeach violates the Sixth Amendment depends upon the extent to which the impeachment evidence would have affected the outcome of the case . . .).

At trial, Orozco gave detailed testimony and provided photos taken in conjunction with her stays in the United States which were entered into evidence. T. Exs, 26I, 26J, 27A-27B, 31A, 31D and 32A-32C.  As noted above, Orozco testified that, on four or five occasions in 1996, her husband Jaime brought cocaine belonging to Patino into the house in Chicago where they lived along with Vasquez.  T 628-30.  Orozco also testified that she lived in a small townhouse on Long Island with her husband and Vasquez, which was used to stash narcotics trafficking money for Patino.  T. 634-37.  Orozco's testimony was then corroborated by Castaño who testified that Jaime worked to sell Patino's cocaine in New York with Vasquez.  T. 760-63.  Comparing the testimony of these witnesses with the proffered testimony of Vasquez, it is very unlikely

---

[14] The translation provided is poor.  The statement included in this opinion is the fairest read of the declaration.

Vasquez' testimony would have affected the outcome of the proceedings.  In fact, at trial, Patino's counsel called a former Immigration and Customs Enforcement Agent, Romedio Viola, who testified that prior statements of Orozco were inconsistent with her trial testimony.  T. 1371-84.  Patino's counsel also attacked the credibility of the accomplice witnesses during his opening - calling the government's witnesses "admitted criminals, admitted drug traffickers, admitted killers, admitted liars, admitted corrupt police officers, every single one of them with much to gain." T. 209.  Despite this testimony and argument, the jury appears to have credited the testimony given by Orozco and Castaño.  Finally, according to the jury interrogatory, Patino was not convicted on conduct that predates December 17, 1997 – the time period during which Vasquez lived with Orozco, *see* T. 1388, 1477, 1497-98.  As such, Vasquez's testimony would not have impacted the outcome of this case.  Accordingly, there is no basis to find that counsel's performance was deficient or prejudicial.  Therefore, the undersigned recommends the Patino's ineffective assistance of counsel claim be denied.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Such objections shall be filed with the Clerk of the Court via ECF.  Any requests for an extension of time for filing objections must be directed to District Judge Hurley prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within this period waives the right to appeal the District Court's Order.  See 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Thomas v. Arn*, 474 U.S. 140,

155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York                    SO ORDERED:
           October 27, 2021

                                                  _____/s_____
                                                  ARLENE R. LINDSAY
                                                  United States Magistrate Judge